UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA, *ex rel.*
[UNDER SEAL],

                         Plaintiff,

     v.

[UNDER SEAL],

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.

COMPLAINT FOR VIOLATIONS OF
THE FALSE CLAIMS ACT

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)

**[FILED IN CAMERA AND UNDER SEAL]**

# ORIGINAL

006183-11  457264 V1

Shayne C. Stevenson (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone: (206) 268-9340
Facsimile: (206) 623-0594

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA, *ex rel.*
GREGORY MACKLER,

                              Plaintiff,

          v.

BANK OF AMERICA, N.A. and BAC HOME
LOANS SERVICING, LP,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

No.

COMPLAINT FOR VIOLATIONS OF
THE FALSE CLAIMS ACT

Filed Under Seal Pursuant to
31 U.S.C. § 3730(b)(2)

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .................................................................................................1

II.  JURISDICTION AND VENUE ...........................................................................4

III. PARTIES .............................................................................................................5

IV.  BACKGROUND .................................................................................................5

    A.   The Taxpayer Bailout of Bank of America.................................................5

    B.   The Home Affordable Modification Program (HAMP) ...........................7

        1.   HAMP Eligibility Requirements.......................................................8

    C.   Treasury's HAMP Servicer Participation Agreement with Bank of America.......11

        1.   The Agreement...................................................................................11

            a.   The Financial Instrument ......................................................13

            b.   The Annual Certification .......................................................14

            c.   Treasury's Supplemental Directives and Handbook.....................15

        2.   Bank of America and other servicers' performance .................................19

V.   ALLEGATIONS.................................................................................................20

    A.   Bank of America Violates its Agreement with Treasury by Fraudulently Handling Homeowner HAMP Submissions, Inquiries and Complaints.................20

        1.   BoA outsources HAMP work to Urban Lending Solutions.....................22

        2.   Relator witnesses and challenges systemic HAMP fraud........................24

            a.   Relator begins as a "customer advocate" for BoA.........................26

            b.   Relator becomes a subject matter expert ......................................31

            c.   Relator is hired as a QC ..........................................................36

            d.   Relator begins work on the "Root Cause" project ........................41

            e.   Root Cause project is dissolved and Relator is terminated...........50

    B.   Bank of America Violates the False Claims Act ................................................50

VI.  CONCLUSION...................................................................................................53

## I.   INTRODUCTION

1.    Plaintiff and Relator Gregory P. Mackler, on behalf of the United States, brings this *qui tam* action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, arising from false and fraudulent records, and false statements material to false and fraudulent claims, made, used and caused to be made, used and presented by defendants Bank of America, N.A. and its subsidiary BAC Home Loans Servicing, LP (collectively "BoA"), to the United States Government under the Home Affordable Modification Program ("HAMP").

2.    In late 2008 and early 2009, the United States Government provided a total of $45 billion to Bank of America pursuant to the Troubled Asset Relief Program ("TARP").  It also extended to BoA an additional guarantee of over $100 billion.  Having concluded that the costs of allowing BoA to fail were too high, the Government decided that taxpayers would save the life of this Bank, and they did.

3.    Because the stated purpose of the financial bailout was to help the American people, and homeowners in particular, HAMP was implemented in March of 2009 to assist the millions of American homeowners facing foreclosure.

4.    Knowing all eyes were upon it, and the billions of dollars it had been given by the Government, Bank of America (the nation's largest mortgage servicer), on April 17, 2009, signed a "Servicer Participation Agreement" (the "Agreement") with Treasury (through its agent Fannie Mae) requiring it to, *inter alia*, use "reasonable efforts" to "effectuate any modification of a mortgage loan under the [HAMP]."

5.    This consideration owed the Government by BoA was in exchange for a commitment by the Government to provide BoA potentially hundreds of millions of taxpayer dollars for its promise and obligation to comprehensively provide HAMP screening for all homeowners serviced by BoA, to extend HAMP Trial Period Plan offers to all such eligible

006183-11  457264 V1

homeowners, and to extend permanent HAMP modifications to all eligible homeowners whose mortgages it services.[1]

6.    Knowing that every successful HAMP modification for a homeowner would negatively impact its bottom line, BoA never entered into the Agreement in good faith. Though mindful it needed to permit some number of HAMP modifications to avoid Government action against it, BoA developed an elaborate scheme to force down the number of successful HAMP modifications. It has done so by deliberately and unlawfully denying scores of otherwise qualified homeowners the ability to successfully qualify for HAMP modifications, while lying to those homeowners persistent enough to escalate complaints and to the regulatory bodies inquiring on behalf of homeowners.

7.    BoA concluded that it was far more lucrative to deliberately force otherwise qualified homeowners *outside* of HAMP so that it could either profit from foreclosure proceedings, force the homeowner into a more costly proprietary mortgage "modification" than HAMP would permit, or otherwise profit from continuing to service the defaulting and defaulted mortgages.

8.    As Relator Mackler directly and independently observed, Bank of America has accomplished this fraud since the inception of HAMP, in knowing violation of the Agreement and express terms of the HAMP "Program Documentation" incorporated therein, through a variety of mechanisms, including the following: (a) developing and maintaining a fraudulently concealed document image repository of homeowner HAMP documentation so that BoA or its agents could falsely deny receiving homeowner documents or claim incompleteness even after satisfactory receipt of them; (b) deliberately deceiving homeowners who complain about BoA's handling of their HAMP inquiries and submissions, with efforts to keep them from HAMP eligibility; (c) intentionally forcing homeowners to wait months before a response to HAMP

---

[1] United States Department of Treasury, *Troubled Asset Relief Program Transactions Report for Period Ending March 8, 2011*, March 8, 2011 at 27. Available at http://www.treasury.gov/initiatives/financial-stability/briefing-room/reports/tarp-transactions/DocumentsTARPTransactions/3-10-11%20Transactions%20Report%20as%20of%203-8-11.pdf ("Treasury Transaction Report").

eligibility determinations (such delay resulting in HAMP "ineligibility") and failing, by design, to communicate HAMP concerns to homeowners, including deadlines, purportedly incomplete records, modification status, risk of losing eligible status, or other eligibility concerns; (d) unlawfully proceeding with foreclosure actions (under "dual track" protocols) while homeowners are reviewed for HAMP eligibility or during a payment period; (e) failing to properly credit homeowner HAMP payments during the Trial Period, resulting in improper denials of permanent HAMP modifications and other improper costs to homeowners; (f) failing to properly "waterfall" homeowners under HAMP requirements, including by pushing proprietary modifications on homeowners as a predatory foist; (g) failing to properly convert eligible HAMP homeowners from Trial Period status to permanent modification status; (h) failing to properly and in good faith evaluate homeowners for HAMP, including failing, by design, to develop and maintain a proper quality control operation as required by the Agreement; and (i) failing to give actual authority to BoA employees and contractors to properly resolve escalated complaints.  Each of these practices violates BoA's Agreement, the binding terms of participation and conditions for federal Government payments under HAMP.

9.      These mechanisms of fraud were and are interconnected and directly observed by Relator Mackler, who worked with various BoA executives while at Urban Lending Solutions ("Urban") beginning in April of 2010.  BoA outsources various HAMP obligations to Urban.[2] Upon witnessing the unlawful, fraudulent practices listed above, among others, Mackler brought his concerns to the highest levels of Urban and to executives at Bank of America.  Eventually, his objections to these practices led to his termination on March 17, 2011.

10.     Because a condition of payment under the terms of the Agreement was and is the requirement that Bank of America service HAMP modification submissions, inquiries and homeowner complaints in good faith, in an effort to assist homeowners in their HAMP modification efforts, BoA's intentional and deliberate efforts to fraudulently operate its HAMP

---

[2] HAMP is the centerpiece of various homeowner assistance efforts under the umbrella Making Home Affordable ("MHA") program.  BoA and Urban typically refer to MHA rather than HAMP, though the latter is the most important component of the former.

program renders it ineligible for federal payments and obligated to return the payments it has improperly received and concealed since it signed its Agreement with Treasury in April 2009.[3]

11.     *Qui tam* Relator Mackler seeks through this action to recover damages and civil penalties arising from Defendants' making or causing to be made false or fraudulent records, statements and claims in connection with Defendants knowing and material breach of its Agreement with the Department of Treasury and its unlawful violation of the False Claims Act. Defendants knew and continue to know that their false and fraudulent HAMP modification program has caused the submission of false claims not eligible for Government payment.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Plaintiff-Relator establishes subject matter jurisdiction under 28 U.S.C. § 3730(b).

13.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint with respect to which Relator Mackler is not an "original source," and all material information relevant to his allegations was provided to the United States Government prior to filing his Complaint, in satisfaction of 31 U.S.C. § 3730(e)(4)(B).

14.     This Court has personal jurisdiction over the Defendants and is a proper venue pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a) because those sections authorize nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, the Defendants can be found in, reside, transact, or have transacted business in the Eastern District of New York.  At all times relevant, Defendants regularly

---

[3] Martin, Andrew, "Big Banks Penalized for Performance in Mortgage Modification Program," New York Times (on-line), June 9, 2011, available at http://www.nytimes.com/2011/06/10/business/10hamp.html?_r=1 (reporting on the Treasury Department's announcement June 9, 2011, that it would withhold incentive payments to Bank of America under HAMP based upon BoA's poor performance).

conducted substantial business within and made significant revenue within the Eastern District of New York.

## III.    PARTIES

15.    Plaintiff-Relator Gregory Mackler is a resident of Longmont, Colorado.  From April 30, 2010, when he began work at Urban as a temporary contractor, through July 26, 2010, when he became a full-time employee, and until March 17, 2011, when he was unlawfully terminated, Mackler witnessed firsthand the fraud that is alleged in this Complaint and is the original source of this information.

16.    Defendant Bank of America, N.A. is a Delaware corporation, with its principal offices located at 101 S. Tryon Street, in Charlotte, North Carolina.

17.    Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, in Calabasas, California.

## IV.    BACKGROUND

### A.    The Taxpayer Bailout of Bank of America

18.    In the fall of 2008 the United States Government responded to a serious crisis in financial market conditions.  Bear Stearns and Lehman Brothers folded.  Unemployment rose to 6.2 percent by September, the same month that the Treasury Department took Fannie Mae and Freddie Mac into conservatorship, the Federal Reserve began an $85 billion taxpayer-funded rescue of American International Group, FDIC took Washington Mutual (the nation's largest savings and loan bank) into receivership, and the S&P 500 index lost another 10% of its already declining value.  The biggest player in the then-worsening housing market crash, Countrywide Financial Corp., was bought out by Bank of America (now a costly albatross for the Bank).  The housing market crash itself gave rise to the specter of millions of Americans on a path to losing their homes, and rising mortgage payment delinquencies.

19.    The Government responded to this crisis on October 3, 2008, with passage of the Emergency Economic Stabilization Act of 2008 ("ESSA"), which created (among other things) the Troubled Asset Relief Program.  ESSA, through the establishment of TARP, granted the

- 5 -

Treasury Department unprecedented authority to spend billions of dollars to "restore liquidity and stability to the financial system of the United States." The Final Report of the TARP Congressional Oversight Panel estimates the program will ultimately cost taxpayers $25 billion.[4]

20.    As the Panel put it, "almost overnight" U.S. taxpayers, via TARP, provided to several large financial institutions an infusion of over $200 billion. This massive bailout was the *but for* cause of the continued existence of several institutions including Bank of America.

21.    On October 28, 2008, BoA received $15 billion in taxpayer funds through TARP in a Government purchase of its preferred stock.[5]

22.    In December of that year the Treasury used taxpayer funds to purchase an additional $20 billion of BoA's preferred shares through a unique Targeted Investment Program made available only to BoA and Citigroup.[6]

23.    In January of 2009, Treasury announced that through the Asset Guarantee Program (like TARP, a program created with the passage of ESSA) the Government would offer an additional guarantee against losses of $118 billion to BoA. This contract was never finalized, but helped BoA assure investors and the broader market that it could absorb unexpected losses.[7]

24.    That same month, on January 9, 2009, TARP provided another $10 billion to BoA through an additional purchase of its preferred stock.[8]

25.    According to the Panel's Final Report, the total federal Government exposure for BoA topped $336 billion in 2009, second only to Citigroup and well more than twice the

---

[4] Congressional Oversight Panel, *The Final Report of the Congressional Oversight Panel*, March 16, 2011 at 9. Originally available at http://cop.senate.gov/reports/library/report-100909-cop.cfm, now available at http://cybercemetery.unt.edu/archive/cop/20110401223133/http://cop.senate.gov/reports/library/report-031611-cop.cfm ("Final Report").

[5] Treasury Transaction Report at 1.

[6] Final Report at 23.

[7] Final Report at 24.

[8] Treasury Transaction Report at 4.

- 6 -

exposure to any other institution.[9]  These mammoth investments and exposures of taxpayer dollars to BoA unquestionably prevented its collapse and allowed the bank to return to profit.

**B.     The Home Affordable Modification Program (HAMP)**

26.     The U.S. housing market reached a new apex earlier this decade and then began a precipitous slide in 2006.  In the months and years that followed, millions of Americans have faced the sudden and unprecedented prospect of foreclosure.

27.     It is generally agreed that policymakers overestimated the extent to which natural market forces, through private modification efforts, would address the growing numbers of foreclosures and delinquencies.[10]  For this reason, the broader economic risks associated with a deluge of non-performing mortgages were only just beginning to be realized in 2006.

28.     In 2007 and 2008, the federal Government made efforts to combat the foreclosure problem, with the FHA Secure foreclosure mitigation program, HOPE for Homeowners, and an FDIC IndyMac loan modification program, but none of these programs sufficiently addressed the crisis and the problem continued to worsen.[11]

29.     In furtherance of the foreclosure prevention mandate articulated by Congress in the ESSA, and with the stated goal of preventing three to four million foreclosures, the Treasury Department rolled out the Home Affordable Modification Program in March of 2009:

> HAMP is designed to provide a path to modifying mortgages and provides subsidies to lenders, servicers, and homeowners to encourage such modifications. Once approved for assistance through HAMP, a borrower must successfully complete a trial period, typically three months, during which the borrower makes payments on the modified mortgage. A borrower who remains current through the trial period becomes eligible for a permanent modification, under which the terms of the trial period remain in effect for a period of five years. After the five-year term is up, the interest rate on the loan can increase by a maximum of 1 percent

---

[9] Final Report at 36.

[10] Congressional Oversight Panel, *A Review of Treasury's Foreclosure Prevention Programs*, December 14, 2010 at 13 ("December Report").  Originally available at http://cop.senate.gov/reports/library/report-121410-cop.cfm, now available at http://cybercemetery.unt.edu/archive/cop/20110401232915/.

[11] December Report at 10-13.

per year until it reaches the prevailing Freddie Mac average interest rate at the time the HAMP modification was made.[12]

30.    HAMP was initially given $50 billion in federal funding.[13]  With those funds, Treasury has provided financial incentives for mortgage servicers to assist homeowners in keeping their homes by way of HAMP modifications.  HAMP was implemented with clear intent that institutions like Bank of America and other TARP recipients would need to participate in the program, even for non-government-sponsored-enterprise portfolios.

### 1.    HAMP Eligibility Requirements

31.    Once a mortgage servicer, such as BoA, signs the Servicer Participation Agreement it is obligated to determine who among the homeowners whose mortgages it services may be eligible for HAMP, and to extend the opportunity for all homeowners to apply for, and, if qualified, to participate in HAMP.  The servicer must identify eligible homeowners and assist in their efforts to secure HAMP modification of their loans.  Servicers such as BoA are obligated to identify those loans subject to modification both through self-initiated investigation of their mortgage service portfolios,[14] and in response to inquiries and modification requests from individual homeowners or regulators acting on their behalf.[15]

32.    As discussed below, the HAMP requirements for servicers are set forth in the Servicer Participation Agreement and the Program Documentation incorporated by and into that Agreement.  A series of Treasury Department Supplemental Directives are part of that Program Documentation, as well as a regularly updated Handbook provided by the Treasury Department through Fannie Mae.  Each of these documents places strict compliance requirements on servicers under the terms of their respective Agreements with Treasury.

---

[12] Final Report at 91 n.286.

[13] December Report at 16 n.23.

[14] Making Home Affordable Program "Handbook for Servicers of Non-GSE Mortgages," Version 3.0, effective December 2, 2010 at 47 ("Handbook").  A new Version 3.1 of the Handbook was issued on May 2, 2011 and is available at https://www.hmpadmin.com/portal/programs/servicer.jsp.

[15] December Report at 14.

33.   Where a servicer identifies a qualified homeowner, the lender must reduce that homeowner's monthly payments until they amount to no more than 38% of his or her gross monthly income (*i.e.*, a mortgage debt-to-income ratio of 38%). The Treasury Department then matches dollar for dollar any further reductions necessary to bring the monthly payments down to 31%.[16] Treasury also provides an up-front payment to servicers for each eligible homeowner who enters a permanent modification. That amount is subject to annual supplementation by Treasury under certain conditions for each eligible borrower being serviced.

34.   In addition to more specific requirements set forth in further Supplemental Directives and the Treasury Handbook, in order to qualify under HAMP a homeowner[17] must satisfy these basic requirements:

   a.   The home must be owner-occupied, not vacant or condemned;

   b.   The remaining balance on a single-unit home cannot exceed $729,750;

   c.   The borrower must actually be delinquent, or default must be reasonably foreseeable, and able to demonstrate financial hardship, including that the borrower has insufficient liquid assets to make the now-required monthly payments; and

   d.   The borrower must have a monthly "front-end" debt-to-income ratio of more than 31% (*i.e.*, the borrower's monthly mortgage payment must be greater than 31% of the borrower's gross monthly income).[18]

---

[16] December Report at 14.

[17] MHA and HAMP documents can refer to "homeowners" or "borrowers" or "customers." For purposes of this complaint, the terms are interchangeable.

[18] U.S. Department of Treasury, *Introduction of the Home Affordable Modification Program*, Supplemental Directive 09-01, at 6, April 6, 2009. Available at www.hmpadmin.com/portal/programs/docs/hamp-servicer/sd0901.pdf.

"Monthly payment" refers not only to the mortgage payment itself, but also applicable taxes, hazard and flood insurance, and homeowner association fees. "Front-end" refers to the ratio of monthly mortgage payment to monthly income. By contrast, a "back-end" debt-to-income ratio compares *all* debt service payments made by the borrower (*e.g.*, car payments, credit card payments) to income. Until June 2010, verification of borrower income was not required for HAMP eligibility.

35.     If each requirement is satisfied, BoA and other servicers must then apply the Treasury's Net Present Value ("NPV") algorithm to the homeowner's situation. This model determines the NPV of the expected income from the mortgage under a modification and compares it with the NPV anticipated with no modification (typically foreclosure or sale at a loss). If the value of the mortgage is greater with modification, the mortgage is "NPV positive" and the servicer is required to offer a HAMP modification.[19]

36.     The next step required of servicers under HAMP is the mandatory "waterfall" analysis to determine what specific type of modification must be applied given the homeowner's situation. First, the servicer must decide whether lowering the interest rate would drive the monthly front-end debt-to-income ratio under 31%. If not, step two requires analysis whether extending the period of the loan (even up to 40 years) would suffice to drive the number below 31%. Finally, if the debt-to-income ratio under both scenarios still exceeds 31%, principal forbearance is required. Only after full consideration and proper rejection of a homeowner for HAMP may a servicer consider extending a proprietary modification offer.

37.     Once approved for HAMP modification, a homeowner who agrees to participate typically begins a three-month Trial Period during which mortgage payments are made under the terms of the modification. If timely payments are made during those three months (*i.e.*, not more than 30 days overdue during any month), the homeowner must be offered a permanent modification, with the terms in effect during the Trial Period extended for 5 years.[20]

38.     In its December 2010 Report, the Panel observed a wide range of conversion rates (that is, the rate of converting Trial Period modifications into permanent modifications) for various servicers, noting in particular that Wachovia Mortgage had a conversion rate of 89% vs. BoA's rate near 30%.[21]

---

[19] December Report at 15.

[20] December Report at 15.

[21] December Report at 22. Through March of 2011, BoA remained the worst performing servicer in terms of converting homeowners from Trial Plans to permanent HAMP modifications. *See, Making Home Affordable: Program Performance Report Through March*

39.     After a homeowner completes a period of 5 years under the terms of the modification, lenders may increase the interest rate on the loan by 1% annually up to the prevailing Freddie Mac interest rate at the time the modification was made.[22]

40.     Though $30 billion is available for this homeowner protection program, less than $1 billion had been spent under HAMP through 2010.[23] According to the Congressional Panel, current projections suggest that far fewer than the four million homeowners initially targeted to benefit will in fact benefit from HAMP, a program that depends for its success upon the good faith efforts of servicers like BoA.[24]

## C.     Treasury's HAMP Servicer Participation Agreement with Bank of America

### 1.     The Agreement

41.     As noted above, HAMP participation by mortgage servicing companies such as Bank of America was effectuated by the signing of a "Servicer Participation Agreement," which BoA signed on April 17, 2009.  As a condition of participation and payment under the Program, once consummated, the Agreement demands "adherence to the Program standards . . . for all the servicer's loans."[25]

42.     BoA's Agreement requires that:

> Servicer shall perform the loan modification and other foreclosure prevention services described in (i) the Financial Instrument attached hereto…(ii) the Program guidelines and procedures issued by the Treasury, including, without limitation, the net present value assessment requirements of the Program…and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications…issued by the Treasury, Fannie Mae, or Freddie Mac in order to change, or further describe or clarify the scope of, the rights and duties of the Participating

---

*2011*," March 5, 2011, at 1, United States Department of the Treasury.  Available at http://www.treasury.gov/initiatives/financial-stability/results/MHA-Reports/Pages/default.aspx.

[22] December Report at 14.

[23] December Report at 16 n.23.  An additional Principal Reduction Alternative program, under HAMP, began in October of 2010 to provide servicers the option to reduce principal balances (rather than simply reduce interest rates) for borrowers with loan-to-value ratios of more than 115% (*i.e.*, borrowers significantly "underwater" on their mortgages).  *Id.* at 16.

[24] Final Report at 93.

[25] December Report at 14.

- 11 -

Servicers in connection with the Program (the "Supplemental Directives" and together with the Program Guidelines, the "Program Documentation").[26]

Servicer's representations and warranties, and acknowledgment of and agreement to fulfill or satisfy certain duties and obligations, with respect to its participation in the Program and under the Agreement are set forth in the Financial Instrument. Servicer's certification as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument will be provided annually in the form attached hereto ... (the "Annual Certification") beginning on June 1, 2010 and again on June 1 of each year thereafter...[27]

43.    Importantly, the Agreement demands that BoA "shall perform the Services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party," and "shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third-party consents and waivers that are required, by contract or in law, in order to effectuate any modification of a mortgage loan under the Program."[28]

44.    "[I]n consideration for" promise of payment to BoA by the Treasury under the provisions of HAMP, BoA is required to perform in accordance with the terms of the Agreement. "The conditions precedent to the payment by Fannie Mae of the Purchase Price" include "the performance by the Servicer of the Services described in the Agreement, in

---

[26] *Commitment to Purchase Financial Instrument and Servicer Provider Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008*, signed by Steve Bailey on behalf of Bank of America, N.A. on April 17, 2009 ("Agreement") at Sec.1.A.  Attached here as Appendix I.

Bank of America, N.A. and BAC Home Loan Servicing, LP signed "Amended and Restated" HAMP Servicer Participation Agreements and Financial Instruments on January 25, 2010, signed by Jack Schakett (former Executive Managing Director at Countrywide, then President and CEO of BAC and Senior VP of BoA, N.A.) on behalf of both entities.  BoA also, memorialized as "Exhibit A" appended to the "Restated" Agreement, agreed in 2010 to participation in the Second Lien Modification Program, the FHA-HAMP program, the Treasury/FHA-Second Lien Program, and the Rural Housing Service HAMP program. Available at http://www.treasury.gov/initiatives/financial-stability/housing-programs/mha/Pages/default.aspx.

[27] Agreement, Sec. 1.B.

[28] Agreement, Sec. 2.A.

- 12 -

accordance with the terms and conditions thereof ..." and "the satisfaction by Servicer of such other obligations as are set forth in the Agreement."[29]

### a.   The Financial Instrument

45.     The Financial Instrument also signed by BoA on April 17, 2009, and incorporated into the Agreement, specifies additional material requirements for satisfaction of the Agreement. Among other things, BoA and other servicers "shall develop, enforce and review on a quarterly basis for effectiveness an internal control program designed to (i) ensure effective delivery of Services in connection with the Program and compliance with the Program documentation; (ii) effectively monitor and detect loan modification fraud; and (iii) effectively monitor compliance with applicable consumer protection and fair lending laws."[30]

46.     Additionally, the Instrument memorializes BoA's "representations, warranties and covenants" to the Government, including that the "servicer is in compliance with, and covenants that all Services will be performed in compliance with, all applicable Federal, state and local laws, regulations, regulatory guidance, statutes, ordinances, codes and requirements ...."[31]

47.     Specifically, BoA "covenants that it will:  (i) perform the Services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under similar circumstances; and (ii) use qualified individuals with suitable training, education, experience and skills to perform the Services."[32]

---

[29] Agreement, Sec. 4.A.  As detailed above, the "Purchase Price" refers to the Government's commitment to pay BoA, through the Government's agent Fannie Mae, initially up to $798,000,000, and later adjusted to several billion dollars, for the performance of its obligations under the Agreement. *See* Agreement, Sec. 4.D.

[30] Financial Instrument, Exh. A to the Agreement, Sec. 4(a).  Attached here as Appendix I, Exh. A.

[31] Financial Instrument, Secs. 5; 5(b).

[32] Financial Instrument, Sec. 5(d).

006183-11 457264 V1

48.    BoA also "acknowledges" in this Instrument that providing "false or misleading information" to the Government "in connection with the Program or pursuant to the Agreement may constitute a violation of:  (a) Federal criminal law ... or (b) the civil False Claims Act."[33]  In order to protect the "reputational interests" of the Government in "monitoring the Program," BoA "covenants to disclose to Fannie Mae and Freddie Mac any facts or information that [the Government] should reasonably expect to know about Servicer and its contractors...."[34]

49.    With regard to "Use of Contractors," the Instrument provides that BoA "is responsible for the supervision and management of any contractor that assists in the performance of Services in connection with the Program," such that it "shall ensure that all of its contractors comply with the terms and provisions of the Agreement" with knowledge that BoA "shall be responsible for the acts and omissions of its contractors as if the acts and omissions were by the Servicer."[35]

**b.      The Annual Certification**

50.    These requirements, and others, are also contained in the "Annual Certification" filed by BoA in June of 2010 and again on June 1, 2011.  The Certification, incorporated into and attached to the Agreement, includes certifications that the "[s]ervicer has performed its obligations in accordance with the Agreement ..." including that "all mortgage modifications and all trial period modifications have been offered by Servicer to borrowers, *fully documented and serviced by Servicer in accordance with the Program Documentation*."[36]

51.    Also certified is the statement included in Sec. 5(d) of the Agreement, that BoA performed all services under the Agreement in accordance with the highest level of professional

---

[33] Financial Instrument, Sec. 5(f).

[34] Financial Instrument, Sec. 5(g).

[35] Financial Instrument, Sec. 6.

[36] Annual Certification, Exh. B to the Agreement, Sec. 3 (emphasis added).  Attached here as Appendix I, Exh. B.  The "Updated and Restated" Annual Certification amends this language to read – "all Services have been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the applicable Program Documentation."  Updated and Restated Certification, at C-1, Sec. 3.  *See* "Annual Servicer Certification," available at https://www.hmpadmin.com/portal/programs/servicer.jsp.

- 14 -

care, using qualified individuals, and that all relevant information the Government should reasonably expect to know about contractors and their performance has been disclosed to the Government.[37]

52.      In these Certifications, BoA and other servicers also "acknowledge[] that the provision of false or misleading information … in connection with the Programs or pursuant to the Agreement may constitute a violation of:  (a) Federal criminal law…; or the civil False Claims Act ….."[38]

### c.      Treasury's Supplemental Directives and Handbook

53.      Treasury's first Supplemental Directive was issued in April 2009 and set forth in greater detail the specific obligations servicers must satisfy under the Agreements they signed.

54.      As the Directive makes plain, servicers must evaluate the eligibility of every borrower within their portfolios first by determining if a borrower is either in imminent default or is already delinquent, and then by applying the NPV test for eligibility.  If "the servicer concludes a current borrower is in danger of imminent default, the servicer must consider HAMP modification," and further "[i]f the NPV result for the modification scenario is greater than the NPV result for no modification, the result is deemed 'positive' and the servicer MUST offer the modification."[39]

55.      Under the 2009 Directive, where a borrower provides verbal financial information to a servicer such as Bank of America, the servicer must send an initially qualifying borrower a solicitation for the HAMP and an offer of a Trial Period Plan.  When the borrower returns those documents the servicer "must review them to verify the borrower's financial information and eligibility – except that documentation of income may not be more than 90 days old as of the determination of eligibility."[40]

---

[37] Annual Certification, Secs. 4; 7.

[38] Annual Certification, Sec. 6.

[39] Supplemental Directive 09-01, at 13; 3-4 (April 6, 2009) ("Directive 09-01") (emphasis in original).  Available at www.hppinc.org/_uls/resources/Supplemental_Directive_09-0.pdf.

[40] Directive 09-01 at 5.

56.     Servicers are directed to assist borrowers by "provid[ing] the borrower with information designed to help them [sic] understand the modification terms that are being offered and the modification process," including "clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan ...."[41]

57.     To this end, "servicers must have adequate staffing, resources, and facilities for receiving and processing the HAMP documents and any requested information that is submitted by borrowers," as well as "procedures and systems" that ensure "inquiries and complaints are provided fair consideration, and timely and appropriate responses and resolution."[42]

58.     For the protection of homeowners and the integrity of HAMP, elaborate document retention policies are mandated for servicers.  This includes retention of "all documents and information received during the process of determining borrower eligibility," including "detailed records of borrower solicitations or borrower-initiated inquiries regarding the HAMP, the outcome of the evaluation for modification under the HAMP and specific justification with supporting details if the request for modification under the HAMP was denied."[43]

59.     Records must also be accurately "retained to document the reason(s) for a trial modification failure."[44]  Where application of the NPV calculus leads to a "decline" for HAMP eligibility, "the servicer must document its consideration of other foreclosure prevention options."[45]  All required documentation must be retained for a "period of seven years from the date of the document collection."[46]

60.     Servicers must also make "reasonable efforts to contact borrowers facing foreclosures to determine their eligibility for HAMP" and suspend all foreclosure proceedings

---

[41] Directive 09-01 at 13.

[42] Directive 09-01 at 13.

[43] Directive 09-01 at 13.

[44] Directive 09-01 at 13-14.

[45] Directive 09-01 at 14.

[46] Directive 09-01 at 14.

- 16 -

where the borrower has not been "evaluated for the program, and, if eligible, an offer to participate in the HAMP has been made."[47]

61.    The Directive explains the steps servicers must take to assist borrowers in completing first a Trial Period Plan and then the agreement outlining terms of the final modification plan.  Additionally, "[i]f the borrower's submission is incomplete, the servicer should work with the borrower to complete the Trial Period Plan submission."[48]  Where it is determined that the borrower fails to meet HAMP eligibility criteria "the servicer should explore other foreclosure prevention alternatives prior to resuming or initiating foreclosure."[49]

62.    All administrative costs associated with processing the HAMP materials are borne by the servicer, and any late charge, penalties, stop-payment fees or other similar fees "must be waived upon successful completion of the trial period."[50]  Servicers may not charge or assess other associated fees to the borrower.

63.    This Directive instructs that servicers "must comply with the HAMP requirements and must document the execution of loan evaluation, loan modification and accounting processes" and "develop and execute a quality assurance program that includes either a statistically based (with a 95% confidence level) or a ten percent stratified sample of loans modified ...."[51]

64.    Treasury has issued several Supplemental Directives since its initial April 2009 directive, each of them refining further the requirements that servicers must meet in order to comply with the Agreements they have signed and to remain eligible for Government payments. All Supplemental Directives, reinforce the fundamental obligation of servicers to proactively and in good faith determine the eligibility of every homeowner for a HAMP modification, and to process applications for eligibility and conversion of HAMP Trial Period homeowners to

---

[47] Directive 09-01 at 14.
[48] Directive 09-01 at 15.
[49] Directive 09-01 at 18.
[50] Directive 09-01 at 22.
[51] Directive 09-01 at 25.

permanent HAMP modifications in good faith, conforming to the highest professional standards. Again, these Directives are part of the Program Documentation incorporated into the Agreement.

65.     Servicer obligations are now memorialized and detailed most comprehensively in the "Handbook for Servicers of Non-GSE Mortgages," incorporated as part of the Program Documentation binding on servicers through the Agreement signed with Treasury.  The Handbook is "intended to provide a consolidated resource for programmatic guidance related to the MHA program for [non-GSE] loans," and "incorporates and supersedes" prior Supplemental Directives, FAQs, and waivers.[52]

66.     Among other things, the Handbook reinforces the obligation of servicers to assist "escalated cases" (*i.e.*, homeowner complaints) responsibly and comprehensively.  Those cases designated as "escalated" include complaints alleging the "servicer did not assess the borrower … according to program guidelines," "inquiries regarding inappropriate program denials or the content of a Non-Approval Notice," the "initiation or continuation of foreclosure actions" in violation of the program requirements, and cases referred from outside sources including Government sources.[53]

67.     To assist such borrowers in "escalated" cases, servicers are required to "designate one or more persons to comply with the requirements" of the Program "and to handle inquiries that rise to the level of an Escalated case."  Servicers must sufficiently staff to "manage the escalation case load" in accordance with time restrictions of the Program and the staff "must be trained on the servicer's case escalation procedures, knowledgeable about [the HAMP program] guidelines and possess the authority necessary to achieve a case resolution …"[54]

68.     Also outlined in detail in the Handbook are the procedures and timetables servicers like BoA must follow in providing Borrower Notices to "every borrower that has been evaluated for HAMP, but is not offered a Trial Period Plan, is not offered a permanent

---

[52] Handbook at 11.
[53] Handbook at 38.
[54] Handbook at 38.

modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial information."[55]

### 2.    Bank of America and other servicers' performance

69.    At the end of 2010, BoA was responsible for approximately half of the backlog of HAMP modification trials awaiting a determination of conversion into permanent status.[56] BoA has the lowest conversion rate amongst all servicers for moving homeowners from Trial Plan to Permanent Modification.[57] For homeowners whose HAMP Trial Plans have been cancelled, by far the largest group among those serviced by BoA were placed in proprietary, non-HAMP-compliant, modifications.[58] The second largest group has experienced foreclosure starts.[59] Of those BoA-serviced homeowners denied HAMP Trial Period Plan participation in the first instance, the largest group of homeowners among them has also been placed into proprietary modifications, followed closely by those homeowners experiencing foreclosure starts.[60]

70.    The requirement of the Agreement that BoA "adhere to all program standards" through good-faith efforts to assist homeowners with HAMP modification and modification eligibility determinations is in tension with BoA's interests, as a servicer, to maximize its profits. These tensions have been examined and commented on by the Oversight Panel.[61]

71.    HAMP aims to counteract those incentives that lead to foreclosures and less favorable modifications for homeowners. Among those countermeasures are the Government payments made to servicers to encourage qualification of homeowners and to directly subsidize the interest rate reductions on HAMP-modified mortgages.

---

[55] Handbook at 49-53.

[56] December Report at 22.

[57] Making Home Affordable Program, *Servicer Performance Report through April 2011*, at 9 ("April 2011 Servicer Report"). Available at https://www.hmpadmin.com/portal/news/press.jsp.

[58] April 2011 Servicer Report at 10.

[59] *Id.*

[60] *Id.* at 11.

[61] These tensions derive from the anti-HAMP-modification economic incentives that drive servicers like BoA. December Report at 17; 59; Final Report at 87 n.277.

72.     Through October of 2010, servicers cancelled over half a million trial modifications, with "incomplete requests" (meaning purported failure of the homeowner to provide the needed documentation) as the single largest reason given to Treasury for the cancellations by BoA and other servicers.[62]  Between 15-20% of those failed modifications have resulted in initiation or resumption of foreclosure proceedings and scores of those homes have been foreclosed upon.  Another 40% of homeowners have received "alternative" proprietary modifications on terms dictated by the servicer and not conforming to HAMP guidelines.[63]

73.     The Congressional Panel noted that since the inception of HAMP in 2009, there had been (through October of 2010) approximately 4.4 million foreclosure starts while less than 500,000 homeowners had been placed in active permanent modifications under HAMP.[64]  Since October, barely 100,000 homeowners have been added to the number of active permanent modifications, while foreclosure numbers have continued to rise.[65]

74.     According to the Treasury Department, for the HAMP modifications it has granted through May 31 of this year the Defendants have received over $75 million in so-called incentive payments from taxpayers under BoA's HAMP Servicer Participation Agreement.[66]

## V.     ALLEGATIONS

**A.     Bank of America Violates its Agreement with Treasury by Fraudulently Handling Homeowner HAMP Submissions, Inquiries and Complaints**

75.     Since its Agreement with the Treasury Department was signed in April of 2009, BoA has been aware that honest business practices conforming to the requirements of that Agreement, an Agreement intended to maximize the number of homeowners participating in HAMP, would cost the bank millions of dollars.

---

[62] December Report at 29-30.

[63] December Report at 30-31.

[64] December Report at 46.

[65] April 2011 Servicer Report at 2.

[66] *Supplemental Information – Home Affordable Modification Program, Non-GSE Incentive Payments* (through May 2011), at 1.  Available at http://www.treasury.gov/initiatives/financial-stability/briefing-room/reports/tarp-transactions/Pages/default.aspx.

006183-11 457264 V1

76.     For that reason, instead of honoring its contract with the Government to, in good faith, help as many distressed homeowners as possible, it made a calculated decision.  It would permit just enough HAMP modifications to occur to create a defense (however untenable) against Government agencies, Congressional skeptics and the public that it was making best efforts to comply with its Agreement.  Simultaneously, however, it would develop business practices designed to intentionally prevent scores of eligible homeowners from becoming eligible or staying eligible for a permanent HAMP modification.

77.     Even more self-serving, BoA has intentionally failed eligible homeowners from the HAMP modification process, often forcing them into predatory "modification" programs designed to cost the homeowner more money.  This despite the fact that the Agreement requires BoA to "evaluate borrowers for and (assuming criteria are met) provide them with a HAMP modification first, ensuring a set affordability standard, and only consider a proprietary modification, the terms of which are determined completely by the servicer, after it has been determined that HAMP is not an option."[67]

78.     As for homeowner complaints and the HAMP requirement that servicers properly and promptly respond to and resolve such complaints, BoA has failed to comply by design.  BoA and its agents never properly hired, trained, or equipped a workforce to genuinely address the scores of homeowner complaints and regulatory inquiries, and instead developed systems and procedures that deliberately obfuscate, mislead, and otherwise deceive those homeowners and regulators, resulting in ineligibility through no fault of the homeowner.

79.     Despite this concealed fraud, BoA has collected tens of millions of dollars from the federal Government for the comparatively small percentage of permanent HAMP modifications it has permitted.  In other words, BoA has had it both ways.  BoA has continued to maximize the value of its mortgage portfolio with anti-HAMP-modification practices and managed to make money by committing fraud on homeowners and the United States Government.

---

[67] December Report at 35.

80.     The false statements, claims and certifications made to Treasury in the context of its Agreement (including its 2010 and 2011 "Annual Certification[s]" required by the Agreement) were and are material to, and conditions precedent for, the payment of millions of taxpayer dollars to Bank of America.

### 1.     BoA outsources HAMP work to Urban Lending Solutions

81.     After acquiring Countrywide Financial in January of 2008, BoA's corporate structure became ever more complex.  Acting under Bank of America CEO Brian Moynihan, Barbara Desoer, former President at Countrywide Financial Corp., now President of Bank of America Home Loans and Insurance ("HL&I"), oversees the Mortgage Servicing operations of Bank of America, including its Home Retention Division ("HRD").  Kenneth Scheller, former Managing Director of Countrywide Home Loans, is a BoA Senior Vice President managing HRD.  Separate from HRD, under the Servicing umbrella, exists the Executive Customer Relations ("ECR") group historically handling highest-level homeowner and regulatory inquiries and complaints.  Also highly relevant, the Strategy, Governance, and Controls ("SGC") group has principals intermixed within the HL&I corporate structure.

82.     The ECR group within BoA contracted with companies, particularly Urban Lending Solutions, to handle a variety of services relating to its participation in HAMP under the Servicer Provider Agreement.

83.     Urban is a privately held company based in Pittsburgh, Pennsylvania with a presence in Broomfield, Colorado, providing private label services to the mortgage industry.  On its website, Urban describes itself prominently as the "Premier and volume leader for home retention (loan modification) analytics and fulfillment to the mortgage servicing industry for over 2 years" and notes that it has recently been named to Inc. 500's list of fastest growing private companies in America.[68]

---

[68] Available at http://www.urbansettlement.com.

84.     Urban claims that its home retention work for mortgage servicers has made it "an industry leader in helping families keep their homes, processing nearly 1 million home retention transactions since 2007."[69]

85.     In addition, while many companies have struggled in the wake of the housing crisis, Urban has ramped up its workforce.  Urban's CEO credited this "hiring mode" with the company's "'preferred vendor'" relationship with banking giant Bank of America, which relies on Urban [ ] to provide title, appraisal and loan closing assistance."[70]

86.     In addition to past business, after signing its Agreement with Treasury, Bank of America outsourced a significant part of its Servicer Agreement obligations to Urban.  Given that BoA is the largest servicer in the country, this method of outsourcing is not surprising and was anticipated by conditions placed on BoA in its HAMP Agreement.  According to BoA, thousands of workers (including Urban employees) are now involved in the loan default program.[71]

87.     Urban's "home retention" operations have now handled Bank of America's HAMP loan modification obligations for scores of homeowners.  In particular, Urban has been delegated part of the HAMP requirement to respond to regulatory inquiries and homeowner complaints about BoA's handling of homeowner HAMP inquiries, document submissions, and eligibility determinations.  As described further below, Urban assists BoA in violating its obligations to Treasury, and to homeowners, by systematically preventing homeowners from mandated opportunities to qualify for or remain in the HAMP, failing to advocate for homeowners, and failing to genuinely attempt  proper resolution of escalated complaints.  All of this is done at BoA's direction with the goal of maximizing its revenue.

---

[69] Available at http://www.urbansettlement.com/company/index.htm.

[70] Dan Fitzpatrick, "Mortgage Woes Lead to Loss of Jobs Here," Post-Gazette.com, January 30, 2008, available at http://www.post-gazette.com/pg/08030/853212-28.stm.

[71] Aldo Svaldi, "Broomfield's Urban Lending Solutions Grows Quickly Amid Stressful Environment," denverpost.com, January 30, 2011, available at http://www.denverpost.com/business/ci_17234161 ("Denver Post Article").

006183-11 457264 V1

88.     Urban consists of two worksites relevant to its BoA-contracted HAMP activities. Urban's so-called "390" group (so named because then-located at 390 InterLocken Crescent in Broomfield, CO) received and scanned incoming HAMP financial documentation and other paperwork from homeowners serviced by BoA and stored documents in what became the Urban Portal digital imaging repository.  BoA outsourced to Urban this document retention operation mandated by the terms of the HAMP Agreement.

89.     BoA has solicited and directed homeowners to return documents, via FedEx, to this Urban location, which has received hundreds of thousands of FedEx packages from prospective HAMP participants.  Urban hired scores of employees at 390 to accept and scan millions of pages of original documents, including homeowner financials, saved on the Urban Portal.  Unfortunately for homeowners, as explained further below, this repository was designed as a black hole for their documents.

90.     Another Urban Broomfield location, at 11802 Ridge Parkway, housed Urban's Outsourced Services unit, offering comprehensive vendor services custom-tailored for clients such as BoA.  This location was responsible for handling, among other things, BoA regulatory responses and escalated homeowner complaints concerning the HAMP.   BoA committed to making Urban a Tier 1 vendor in exchange for working with it to meet Bank goals, goals diametrically opposed to the intent and purpose of HAMP.   This status offered Urban the prospect of hundreds of millions in revenue for years to come.

91.     The Outsourced Services unit functioned initially within BoA's ECR group, with temp workers and Urban employees given BoA titles within BoA's Office of the CEO and President.  To the outside world of homeowners and regulators, Urban's workforce appeared indistinguishable from BoA's own employees.

## 2.      Relator witnesses and challenges systemic HAMP fraud

92.     On April 30, 2010, Mackler began work at Urban as a temporary contractor.  For three weeks, Mackler and several dozen other temporary workers were trained in the job function of Customer Advocate for Bank of America's Office of the CEO and President.  This training

- 24 -

was led by "in-classroom" BoA officers, as well as a contingent of on-site "out-of-classroom" BoA executives. Additionally Urban employees Sean Jefferson and Lisa Reichert facilitated training for the first week. Mackler and the others were to begin thereafter as Customer Advocates in Urban's Outsourced Services Division. Virtually none of the trainees were remotely qualified for the positions they then filled, nor were they given adequate training for the job. Mackler observed that those persons with more talent, intellect, and qualifications did not last long, but were often fired or encouraged to quit.

93.      Mackler was instructed by the trainers that the job of Customer Advocate was to advocate for individual homeowners in response to a regulatory inquiry on their behalf, or following an executive complaint received by Bank of America. It was emphasized that two categories of homeowners existed: those in the "default" sphere and those in the "non-default" sphere.[72] Those in the default sphere are of relevance here. Within that sphere are homeowners not current on mortgage payments or facing imminent default, and in need of loan modification. Treasury requires BoA to determine whether each and every such homeowner might be eligible for a HAMP modification.

94.      Mackler and other trainees were given a crash course on Making Homes Affordable and the HAMP guidelines. Mackler was told, with the others, that the advocates were being hired to handle the influx of complaints resulting from the HAMP commitments.

95.      These Customer Advocate trainees, including Mackler, were told they would be advocating at the highest level of authorization "acting fully on behalf of the CEO and President" when inquiring and advocating on behalf of a given homeowner within the Bank. In truth, the trainees were not remotely qualified to intelligently advocate or seek proper resolution for homeowners, which, as Mackler soon discovered, is precisely what BoA desired. Furthermore, BoA developed numerous protocols and procedures to prevent Customer Advocates from properly researching and resolving HAMP inquiries and complaints.

---

[72] For purposes here, "non-default" complaints refer to any complaints not addressing loan defaults or modifications.

### a.  Relator begins as a "customer advocate" for BoA

96.  On or about May 24, 2010, Mackler began work on the floor as a Customer Advocate – answering the phone, "Thank you for calling Bank of America's Office of the CEO and President, this is Gregory Mackler.  How may I help you?"  At that point, Mackler was not aware of any fraudulent activity and was looking forward to advocating on behalf of struggling homeowners and helping to correct what was being characterized as an enormous volume of HAMP "errors" within the Bank's multiple lines of business.

97.  Two weeks prior to Mackler's training, approximately 150 temporary workers were trained as Customer Advocates and began in that role at Urban.  Mackler immediately began assisting dozens of these advocates on the floor with "on the job training" despite being part of the latter, smaller trainee pool.  The marginal relevant industry experience the temp workforce had, if any, did not translate to the Customer Advocate position, which was primarily an operations position.  Immediately Mackler became aware of an unusually high turnover rate within the temp workforce and amongst the managers that were Urban employees.  Mackler began to acquire systems knowledge, and informally began inquiring about the general business practices "on the floor."

98.  In short order, Mackler learned that homeowners were not being advocated for, as the majority of the temporary workers had absolutely no idea how to begin to perform their job responsibilities, nor how to use and access the tools necessary for effective homeowner advocacy.  In fact, Mackler discovered that many of the tools necessary to properly research and resolve inquiries received from regulatory authorities and homeowner complaints were not being made available to the Urban Advocates.  Advocates could not and were not trained to access the necessary BoA computer systems, neither did they have any means to contact the relevant BoA associates that were working on HAMP applications corresponding to regulatory inquiries or homeowner complaints.

99.  Advocates were told that it was a "downstream process" and that they did not need to communicate with the line of business for effective advocacy on HAMP complaints.

006183-11 457264 V1

Many temp workers quit the job out of frustration and a fear that they would be terminated because of their perceived incompetence, though in fact (as it became clear) BoA had orchestrated it that way. As Mackler continued to discover, BoA was not looking for employees to actually advocate and escalate matters to assist homeowners in entering the HAMP process, but was merely attempting to create that impression. Instead, the entire focus of the operation was on "closing" issues.

100.    Urban employees, known as Team Leads (or Team Managers) and Assistant Team Leads/Quality Control ("QCs"), ostensibly supervised "the floor" of Customer Advocates and provided quality checks on their advocacy. For every 10 or so advocates, a Team Lead was formally in charge. As Mackler soon realized, however, these Team Leads and QCs (though they became Urban employees) almost entirely came through temp agencies and were themselves no more qualified for their positions than the Advocates, having experienced the same training.

101.    Mackler also began to learn that the BoA architecture for handling HAMP mortgage modification complaints was rooted in fraud. One of Mackler's first homeowner complaints that he handled as a Customer Advocate came from a person we will refer to as Mrs. E., a resident of Florida. In 2008, Mrs. E. and her husband sought a modification from BoA as a result of the husband's loss of income. On numerous occasions she had contacted BoA attempting to learn the current status of her request, now outstanding well into the time period that the Agreement required BoA to consider her for a HAMP modification, and to learn the status of the documentation she had provided to BoA numerous times.

102.    As the "single point of contact" Customer Advocate, Mackler escalated throughout the Bank of America corporate hierarchy, in a good-faith effort to address the homeowner's concerns.[73] Mackler learned that a BoA "workout negotiator" (a BoA employee

---

[73] HAMP requires servicers to create a "single point of contact" for homeowners. Though designed to prevent homeowners from being subject to the confusion of multiple contacts with various departments, BoA uses the "single contact" requirement perversely. By preventing homeowners from going anywhere *but* to the single point of contact responsible for addressing their concerns, BoA simply prevents that single contact from effectively advancing a given homeowner toward consideration of HAMP eligibility – there being no one else for the homeowner to turn to.

named Robin at HRD) had solicited Mrs. E., offering that if she voluntarily cancelled her HAMP request, BoA would provide her with a permanent proprietary modification within two weeks. This was a plain violation of HAMP requirements. In an effort to push her toward proprietary modification of her loan, Mrs. E. was also told that it would take "over a year" to complete a proper HAMP review (another violation of HAMP requirements).

103.    Mackler reached out to HRD to determine the genuine status of Mrs. E.'s modification review and to resolve apparent confusion about BoA's handling of the matter and alleged solicitation. After repeat emails from Mackler to various BoA personnel attempting to get a response, Mackler continued to escalate.

104.    Mackler asked if *any* modification review was under way for Mrs. E. and her husband. The SVP refused to accommodate any request for information, and redirected Mackler back to her uncooperative reports. Mackler then escalated within Urban, to John Beranich (VP of Outsourced Services at Urban) complaining of BoA's treatment of Mrs. E.'s complaint, and the lack of any cooperation for the Office of the CEO and President.

105.    Beranich reached out to Tom Reilly, a BoA executive who fulfills a variety of roles within ECR and SGC, and the person integrating the contractors into the ECR model for Default Servicing. Reilly at that time was BoA's relationship manager with Urban. Reilly told Mackler to call BoA executive Ken Scheller, and related that all of HRD reported up to him. At this time Mr. Scheller was in the role of SVP of Risk Management for BoA. Mackler called Scheller and left a message, but hearing no response, he contacted several high-level executives, both above and below Scheller.

106.    Scheller eventually returned the call to Mackler, though not fully understanding that Mackler was merely a Customer Advocate at an outsourced company, rather than an Executive within BoA, or even a principal with the outsourced company. Scheller quickly reminded Mackler that BoA and HRD was "not of course interested" in faithfully reviewing HAMP modification requests, and that he should "back off" the issue. This was stated as if it were common knowledge of which Mackler should have been well aware. Scheller repeatedly

- 28 -

expressed frustration that he thought everyone "at the Bank" was "on the same page" in terms of not really working to legitimately review homeowners for HAMP, and thought the ECR group fully understood this as well. Mackler, unbeknownst to Scheller, was not a principal of BoA's ECR group.

107.   Scheller continued to express frustration as to why ECR Customer Advocates would be calling to bother his HRD Associates regarding individual homeowner HAMP modification reviews and complaints, and escalating through his Division on their behalf. Scheller described that this compromised the HRD Associates' efforts to follow executive direction to decrease HAMP participation. Scheller stated that advocating on a homeowner's behalf by escalating throughout HRD, when the HRD Associates were just following direction, was going to complicate HRD operations. Mackler told Scheller that he should speak with Beranich regarding these concerns, and considering that Beranich had previously had oversight over the Urban "390" HAMP documentation project for HRD, they might find common ground, now that Beranich was directing the ECR advocacy project for Urban.

108.   Mackler disclosed his conversation to Beranich, both verbally and via email. Mackler was asked by Beranich to send him and only him an email describing this conversation with Scheller. Beranich brought Mackler to his office, where Mackler learned that Reilly was listening in via conference call.

109.   Reilly asked Beranich a series of questions to understand exactly what Scheller had revealed in his conversation with Mackler. Reilly directed Beranich to ensure that Mackler be given direction not to tell anyone, at either Urban or BoA, that the conversation with Scheller had ever occurred. Beranich informed Mackler that he was a "rising star" and would soon be hired as a QC, and demanded again that Mackler keep this information strictly confidential.

110.   Mackler soon learned that BoA had given direction that the BoA Subject Matter Experts ("SME"s) (Anna Corder and Susan Park, AVP Operations Specialists at BoA and Kristina Raisley, a BoA Advocate) staffed on location at Urban were no longer available to answer questions about how to perform the job function, or about how to respond to regulatory

- 29 -

inquiries or executive complaints. Urban temporary workers were given direction not to interact with them at all. Given the fact that QCs and Team Leads themselves had no more training than Advocates, and were charged with supervising and assisting Advocates to handle regulatory inquiries and customer complaints, both Team Leads and Advocates had nowhere to turn. Amidst these changes there was mounting pressure from BoA executives and from Urban Executives to "close" more Service Records (or "SRs," as the homeowner cases were termed) to meet daily and weekly "goals."

111.    While attempting to advocate for homeowners, Mackler continued to encounter a "Chinese wall" within BoA's HRD Division which made it impossible to research any resolution, or learn accurate information on behalf of homeowners regarding HAMP modifications. Scheller had specifically alluded to this one-way communication channel as being established by design. Even basic questions whether a HAMP modification review was currently being conducted for a homeowner, like Mrs. E., were not to be answered.

112.    Associates in HRD, so-called "Workout Negotiators," were trained to communicate that they were not a part of the MHA/HAMP process, that the caller had reached the "wrong department," and that the HAMP process was a "downstream process." This did not reconcile with internal systems that documented who the designated Workout Negotiator/HAMP Monitor was as the "point of contact." As such, no information could be made available as there was no "point of contact" even for an Advocate in the Office of the CEO and President acting on a regulatory inquiry with purported "full authority" to resolve a regulatory concern.

113.    Mackler experienced this situation time and time again as a Customer Advocate. Mackler witnessed scores of other Advocates experience the same stonewall, while either coaching or training them, and observed countless homeowner requests for loan modification assistance closed by Advocates who failed to properly resolve homeowner inquiries after being shut down by BoA in their efforts to address HAMP concerns. This was done out of pressure by BoA to close files even where the line of business (*i.e.*, HRD) was itself obstructing the process by refusing to verify what should have been readily ascertainable information about the status of

- 30 -

documents or a HAMP eligibility determination. This failure to verify *any* information was established by BoA and a symptom of keeping Advocates from learning the information they needed in order to *be* Advocates.

### b.    Relator becomes a subject matter expert

114.    In June 2010, around the same time as his conversation with Scheller, Mackler was promoted to the position of internal Subject Matter Expert for Urban, one of four selected for that position. The purpose of the role was to cascade information to the other Customer Advocates regarding the proper way to close SRs, research regulatory and executive complaints, and resolve homeowner concerns. This was now a defined resource for Advocates "on the floor," whereas Mackler previously, but informally, did much the same work.

115.    . In the position, Mackler was ostensibly asked to enable and assist the Advocates on the floor, to define and verify BoA guidelines to ensure proper advocacy for homeowners. Given his frustration as an Advocate, Mackler thought he might have more authority to properly investigate, review, research, and resolve regulatory inquiries and executive homeowner complaints in this role. He immediately learned he was not permitted to do so, and was stopped at every turn. Mackler was told that the only goal was to "close" the SRs, and that Urban's Outsourced Services group would only survive by meeting the client goals.

116.    Mackler continued to press for hard answers regarding Mrs. E., as her complaint continued to be unresolved despite repeat escalation. Urban pressured Mackler to simply "close" the SR. In over two months, Mackler had been unable to determine even whether Mrs. E. still had an actual open HAMP modification review underway. Associates within HRD still categorically refused to tell Mackler whether Mrs. E. was under review, and if so, what kind of modification review.

117.    Mackler documented this long trail of obstruction and obfuscation by numerous BoA personnel in the Siebel system of record (a legacy holdover complaint tracking system from Countrywide) as well as with seemingly countless emails. At one point a National Servicing Executive communicated to Mackler that "behind the HAMP curtain" one Morgan Haijduk (a

- 31 -

Workflow Coordinator for BoA) could provide the information. Mackler contacted Haijduk, who stated that his number should not have been given out, that he should not be contacted, and that the HAMP process was orchestrated to be a "downstream process" only. Haijduk continued to obstruct Mackler's efforts at research and resolution.

118.   Eventually, Vinesh Reddy (BoA AVP of Advocacy/Exclusions in HRD) and Haijduk participated in a conference call with Mackler to discuss the MHA/HAMP process, and specifically Mrs. E.'s concerns of a predatory foist. Reddy told Mackler that Mrs. E. was "on hold," as were all BoA homeowners that had requested HAMP modification assistance.

119.   Reddy and Haijduk explained to Mackler that BoA had instructed that there be a *de facto* lockdown, stalling all HAMP modification reviews, and keeping all homeowner inquiries in abeyance. This delay, communicated by Reddy and Haijduk, effectively allowed BoA to eliminate a large backlog of applications and inquiries from HAMP eligibility. This was to be justified based upon a novel interpretation of a Supplemental Directive requiring documents to be submitted by homeowners within 30 days, and completely reviewed 30 days after receipt. BoA's "interpretation" was to hold all modification reviews until June 1, 2010 after which time HAMP eligibility for these homeowners would be permanently eliminated by BoA's manipulation of the new 30/30 directive.[74]

120.   Mackler pressed and Reddy confirmed this was the instruction received directly "from the top" of HRD, HL&I and Corporate (meaning Desoer and Moynihan). Mackler asked whether such a protocol would not be transparently fraudulent. Reddy stated that executives had directed that some defined number of homeowners would be permitted to "slip through" in order to create the appearance of a legitimate HAMP review process.

121.   Both Reddy and Haijduk confirmed that this was common knowledge within the executive channel, and had been directed in unambiguous terms. Mrs. E., Reddy made clear,

---

[74] In June of 2010, a new requirement that homeowners provide additional income-related documents in order to establish HAMP eligibility was imposed. Handbook at 56, 59. Mackler learned that BoA, knowing of this change well in advance, improperly held scores of reviews in abeyance in violation of then-existing requirements, so that it could render them "ineligible" for HAMP due to failure to provide documents never required at the time.

was part of the group that would be improperly delayed and ultimately sent an "adverse letter" denying her a HAMP modification under the pretense of the new 30/30 rule for complete documentation and review.

122.   Mackler continued to challenge this effort.  He inquired about instances of "Bank Error" where there was documented proof that a Bank Associate adversely advised a homeowner in a manner that prevented him or her from meeting the Bank's requirements for documentation or successfully completing the next step in the HAMP process.  Mackler observed numerous instances where the BoA advocates charged with answering homeowner questions regarding HAMP modifications were providing blatantly incorrect information.  Mackler in fact identified that Mrs. E.'s paperwork was falsely recorded as "not received" even though a FedEx tracking number showed obvious receipt.  HRD had falsely documented its records to the contrary, as Mackler came to see in scores of cases.

123.   Reddy and Haijduk stated that even where there existed a documented Bank Error, there was no provision allowing for a homeowner to challenge or appeal the permanent loss of HAMP eligibility.  Mackler continued to challenge this point, piecing together the manner in which this had been orchestrated.

124.   Mackler observed that HRD's system of record was regularly populated with scripted comments for a homeowner undergoing HAMP review, to the effect that documents were alleged to be "missing" or "incomplete," and that calls were not to be transferred.  Efforts were simply not being made to communicate this information to homeowners.  Mackler questioned the practice whereby homeowners were then informed that no new information on their modification review was currently available, that they remained "under review" but that someone would call them within 60 days, which was outside the 30/30 clock.  Meanwhile, ECR was directing that homeowners be advised Trial Periods were expected to take six months or longer.  Reddy and Haijduk acknowledged the incongruity of this practice, but Haijduk then became so distressed about what was being revealed in the call that he hung up.

- 33 -

125.    Mackler and Reddy continued to talk about MHA/HAMP operations.  Mackler stated that it would not be acceptable for Mrs. E. to be included in the "adverse response" group as it was improper and there was heightened litigation risk with this homeowner.  Mr. E was an Underwriter with AIG, and the homeowner had been documenting all the Bank errors and improprieties of her Modification review that had originated with an initial inquiry in 2008.  Reddy acknowledged that he would personally "get involved" to help get the homeowner file "through QC" instead of being rejected with the rest of the homeowners.  Ultimately Mackler was able to get Mr. and Mrs. E. a permanent HAMP modification, although it was not made permanent until several months later.

126.    As a Subject Matter Expert, Mackler continued to witness the same improprieties he observed as a Customer Advocate, e.g., homeowners being told they were "currently under review" for HAMP modification when several months had passed and there was no evidence of any such review.  Instead, system documentation directed that calls not be transferred and that documents were missing or incomplete.  This despite evidence that all materials had been sent repeatedly (using the Bank-provided FedEx mailers no less).

127.    Among other practices, Mackler reviewed several complaints where BoA had classified a home as "vacant" or having been leased, (i.e., not "owner-occupied") in order to disqualify an otherwise qualified homeowner from HAMP eligibility.  These "drive-by" assessments of vacancy occurred even in cases where homeowners sent photographs of their occupied homes, well-kept gardens, and other obvious indicia of owner occupation, and stated that they never left their homes for more than a few hours.  Mackler observed that some homeowners were repeatedly forced to submit documents challenging these "vacancy"-based denials.

128.    In July, Mackler was temporarily reassigned, as part of his Subject Matter Expert responsibilities, to assist in the training of new Customer Advocates for their three-week training period.  At that time, Mackler was informed by Joe Bosse (Mackler's Team Lead) and Elizabeth Farmer (formerly a QC, now the Team Manager of the QCs) that he would soon become a QC

- 34 -

himself (as Beranich had promised).  At that point he would no longer be a temp but would be hired by Urban as a full-time salaried employee.

129.    During the training, Darius Alexander (one of Urban's Assistant Training Managers) emphasized repeatedly to the new Customer Advocate trainees that how they were being trained may be different from how they were expected to perform their job function "on the floor."  Alexander repeatedly established that if the trainees were told to do something different once "on the floor," they should do what their Team Lead directs, not what they recall from training.  He established that the workforce was under contract with Bank of America, and that the client dictated how Urban performed its job function and the quality guidelines of the positions.  Alexander established for the temps that they would have the most success by doing as they were instructed by Team Lead and Bank relationship managers, not by adhering to the "*right*" way to do things."

130.    Urban had experienced extreme levels of employee turnover, understood internally as "churn."  BoA was dictating terminations of Customer Advocates *en masse* and other Advocates were quitting under the pressure of impossible production expectations that the Bank had established.  In this environment, it was emphasized to trainees that even if the HAMP guidelines suggested that something else should be done in response to a complaint or regulatory inquiry, an Advocate always needed to do what they were told "on the floor" by their Team Lead.  It was established that "we" only all had jobs if Urban as a whole met the production expectation BoA had established.  Doing things the "right way" individually could translate into temps no longer being needed, and everyone "losing their jobs."

131.    It was made plain in the training that Team Leads emphasized closing the files, not following specific BoA ECR quality protocols.  This emphasis on deviating from formal guidelines and protocols led an appreciable number of trainees to actually drop out of the training during each session.  Mackler observed a population of trainees that would articulate a clear understanding of their personal culpability in what they were being asked to do, who would

- 35 -

then have interactions with Trainers or BoA executives that resulted in their voluntarily quitting, or subsequently being pulled off the temp assignment by their staffing agency.

### c.   Relator is hired as a QC

132.    On July 26, 2010, Mackler accepted an offer of full-time employment as a QC (Quality Control) at Urban.  In that capacity, Mackler reviewed the (a) final draft "Response Letters" written by Customer Advocates to be sent to the regulatory entity or to the homeowner, (b) the process by which the Advocate addressed the stated concerns, (c) the documents provided by the complaining homeowner, and (d) the system documentation that resulted from the research and resolution.  Additionally, Mackler was assigned to evaluate the work of the other QCs as part of a "second QC" process.  In looking at this larger sample of SRs it became clear to Mackler that homeowners' "original" documents were seemingly never accessible to HRD during the homeowner's HAMP review, nor to any Customer Advocate or QC investigating a regulatory or executive complaint.  The Advocates and QCs only saw whatever materials the homeowner sent in *again* and in furtherance of his or her complaint itself, after they had escalated to the highest office within BoA, or after they had contacted a regulatory agency.

133.    Mackler evaluated Customer Advocates' handling of homeowner complaints once they were submitted for closure, under the auspice of having been brought to resolution.  In that role, Mackler was specifically instructed not to audit whether Customer Advocates, HRD advocates at BoA (who initially review HAMP applications), or others had falsified information on the system of record for a given homeowner's account.  This direction was repeated on national conference calls with BoA ECR quality led by BoA employee Shawn Pierce.  Such falsifications typically included falsely documenting that homeowners had not satisfactorily submitted their financial documentation necessary for HAMP eligibility determination, when in fact it was abundantly clear that homeowners had sent in these requirements multiple times within the necessary deadlines.  Often those homeowners provided certified mail or FedEx tracking numbers.  In other instances, Customer Advocates or HRD associates would falsify

- 36 -

research or comments, to allow closure to meet suffocating "production goals" the Bank demanded.

134.   Mackler encountered hundreds of homeowners that showed convincing evidence of document submission.  Mackler saw the incongruity between HRD's documenting of financials as "missing" or "incomplete" without specificity, and the manner in which Customer Advocates were documenting the system of record to "close" without proper resolution.  Mackler was given specific direction not to investigate or inquire about what Customer Advocates were documenting onto BoA systems, even when it became clear that a business practice "on the floor" was in place to fabricate any research to substantiate closure, even though the homeowner would ultimately suffer adverse consequences, including foreclosure, and even though the regulatory responses were being fraudulently authored.  These practices were known as routine and observed by Mackler.

135.   Mackler also observed in this capacity that several homeowners were required by BoA to enter a "Special Forbearance" program before HAMP eligibility was determined.  This forbearance program, however, functioned to increase a homeowner's debt and overall obligation to the lender.  This resulted often in an "excessive forbearance" determination.  By virtue of this, several homeowners were disqualified under the NPV calculation from participating in HAMP, just as BoA intended.

136.   Other homeowners were required to make payments to BoA that were either never credited properly toward Trial Period payments or credited against their principal, but instead parked in a "partial account."  At other times these payments were not applied in a timely manner so as to render the payment "late."  By not applying the payment in a timely manner, BoA could disqualify otherwise qualified homeowners from securing a permanent HAMP modification.  Mackler at times demanded that a homeowner's payment be immediately applied to his Trial Period balance, but encountered obfuscation.  Mackler inquired why payments held in "partial" accounts would often equal or exceed a note payment, but would not be properly

- 37 -

applied.  He learned that HRD held off until a modification review was "complete" or "permanent" before any crediting, an obvious violation of HAMP requirements.

137.    Mackler's efforts to diligently follow-up on complaints he reviewed was not appreciated or valued.  He was told to stop inquiring about payment irregularities and other improprieties.  During Mackler's first week as a QC, Farmer (Team Manager of Quality at Urban) informed him that already he needed to increase his production by "passing" more of his reviews, or SRs.  Mackler responded that his "real" production was very high, and that even though the SRs being submitted to him did not meet BoA ECR Quality guidelines, he was reviewing more than other QCs.  The vast majority of these reviews consisted of Customer Advocates' draft letters informing regulatory agencies or homeowners that a HAMP review was "pending" or currently under way, when it was actually documented no such review was pending at all or that review was derailed by "missing" or "incomplete" documents, none of which was told to the homeowner.

138.    The practice of merely responding that a review was "pending" was born of a BoA ECR business practice known as "forward progress" – as long as a review was currently underway, the Customer Advocate was not responsible for properly researching and reviewing the regulatory or homeowner concerns.  Mackler would not agree to pass or approve such untruthful "forward progress" closings where an actual review was not active.

139.    Farmer reminded Mackler that he, and other QCs, only get "credit" when they pass or approve a given review.  BoA and Urban did not give credit for properly identifying where an SR closure did not meet BoA ECR Quality guidelines.  The requirement was to pass a fixed number of reviews per day, and Mackler was not meeting that arbitrary quota.  Farmer explained further that by failing to pass SR reviews, the number of complaints "closed" by Urban was not meeting the requirements of BoA.  Mackler told Farmer that he would not indiscriminately "pass things through" to satisfy arbitrary production metrics that fraudulently corrupted the HAMP process.  Mackler stated that his reviews of other QCs SR closures revealed that they were never properly reviewed.

- 38 -

140.    Most direct, Farmer told Mackler that files should be passed even if they did not properly meet guidelines, as "everyone was at risk of losing their jobs." Farmer directed that BoA was threatening to shut down Urban's ECR project on a daily basis if more SRs were not closed to meet the daily and weekly goals. It was explained that BoA did not care if proper protocols were met, only that they wanted these regulatory and executive complaints "closed" at all costs. In context, that meant "passing" SRs falsely, even if it resulted in an eligible borrower being further misled or wrongly denied eligibility leading to foreclosure.

141.    Despite repeated threats from Farmer that Beranich would terminate him, Mackler made clear he would not "pass" on any files that were not properly processed for the homeowner. The justification given, and advanced by BoA, was that any "mistake" in passing SRs could be addressed when the homeowner initiated *another* complaint. In other words, the logic was to close files as quickly as possible and worry about the errors the next time. For many homeowners, of course, there would be no "next time" because pending foreclosure and increased fines and penalties would commence.[75]

142.    In or about August of 2010, Beranich called a meeting with Farmer, Betsy McManaman (then an Urban Production Manager, to which Team Leads report) and all the QCs, including Mackler. Beranich informed the QCs that they would ultimately report to McManaman through Farmer and that a "Drive to Five" to reduce the complaint pipeline was being implemented. This was a BoA effort to reduce the "pipeline" of complaints. He stated further that Brian Moynihan himself, the CEO of BoA, was pushing to drive down the number of existent ECR regulatory and homeowner complaints (again, a small subset of the overall number of modification-seeking homeowners) from roughly 12,000 to 15,000 down to 5,000 within a

---

[75] The lag time between when a homeowner filed a complaint with the Office of the Comptroller of the Currency, or with a state Attorney General's office, began before the complaints were submitted to BoA. By the time a homeowner could re-escalate, if their previous regulatory or executive complaint was improperly closed, it would be too late for almost all of them. This left the vast majority of homeowners in the position of having to accept the solicitation of the proprietary (also known as "traditional" or "manual") modification. Mackler began to identify an orchestrated process through which BoA led a homeowner into forbearance and default to eliminate a customer's HAMP eligibility, leaving a homeowner with no choice but to accept a predatory foist or lose the home.

- 39 -

matter of months. Again, the majority of these complaints were escalated claims by a regulator or homeowner objecting to treatment by BoA in handling a particular HAMP eligibility determination. Jim Emerick, a BoA ECR executive, communicated that Moynihan himself was checking in on the "pipeline" (the number of outstanding ECR complaints) daily in pursuant of this goal.

143.    Beranich emphasized that QCs and Advocates were going to need to work harder and commit to longer hours as needed to close all of the complaints that could physically be closed. He stated that everyone could potentially lose their jobs, including himself, if this could not be done to accommodate BoA's production demands. No additional QCs were hired to meet this increased demand for production. As the demand to close SRs continued, some QCs asked if they could "pass" SRs to meet the production goals without putting their personal identifier in the system of record, for fear of personal liability.

144.    The day that the "Drive to Five" was announced, QCs, Customer Advocates and others were directed to keep working well past the end of their shifts, to close as many claims as they could physically process. From that point forward, Customer Advocates were given crushing daily and weekly goals to meet – working early mornings to late evenings, working on weekends, and forgoing breaks during the day. Customer Advocate turnover (the "churn" rate) continued to grow as the pressure to fraudulently process unrealistic numbers remained unreasonable, and those physically unable or unwilling to comply were routinely terminated under fraudulent pretexts. BoA directed this process and was involved in the details of termination discussions, having sent a review team to examine which Advocates were not playing ball. Team Managers and Team Leads who failed to effectively "push the numbers" were also terminated or demoted.

145.    Farmer herself was later fired by order of Jim Emerick, the BoA executive at the center of the convergence between BoA's SGC group and its ECR group, for failing to sufficiently push Urban employees to drive down the backlog by closing on complaints, regardless of merit. This pressure from BoA was constant and delivered in no uncertain terms –

Urban would lose its lucrative BoA ECR contract if it failed to pass and close complaints utterly irrespective of Treasury-mandated guidelines for handling escalated complaints.

146.    Customer Advocates were not allowed to leave for the day until they and "the floor" had met their daily goal of SR closure, and were forced to come in and work on weekends if either they individually or "the floor" had not met the weekly goal BoA had established. At this point BoA began distributing a "red list" of particular SR numbers that had been identified by BoA ECR executives as needing to be closed without delay.

147.    Mackler at this time also noticed that the system of record was being routinely falsified. Whenever an Advocate would fail the QC process for not contacting the line of business to properly research the involved issues, the system would be updated (often within fifteen minutes) with fabricated emails from HRD Associates who were not even in-office to communicate with the Advocate at those hours. QCs were given absolute direction that they were not to investigate these improprieties, but instead to take everything submitted to the system of record at "face value." BoA personnel were observed "helping" Urban Advocates close files, and giving direction to fraudulently alter the system of record to allow closure.

148.    Ultimately the "Drive to Five" was considered a "success" by BoA, though it rendered scores of potential HAMP participants ineligible simply in order to meet an artificial requirement imposed by BoA.[76]

### d.    Relator begins work on the "Root Cause" project

149.    In September of 2010, during the week following announcement of the "Drive to Five," Mackler was moved from his position as a QC into a new position as the Point Person for a BoA Root Cause Analysis project. Beranich made it clear to Mackler that neither Urban nor BoA knew how to make use of his talents, and that they "didn't know what to do with [him]" because he had not been willing to improperly and swiftly close files as either a QC or a Customer Advocate. He admitted that Mackler knew "too much" about the operation. Beranich

---

[76] Denver Post Article at 3. Mackler was included in leadership channel conversations where direction was given to fabricate cause for termination for countless employees and Team Managers.

- 41 -

discussed Mackler's intellect, knowledge and unique skillset, as well as his unwillingness to improperly close files, with Tom Reilly and others at BoA. Reilly, and others at BoA, directed Beranich to move Mackler to the Root Cause project, a project outside of ECR and instead within the realm of BoA's SGC group.

150.    The Root Cause project (later termed Root Cause-Denver) was designed by BoA to report not through ECR, but rather through SGC as a risk analysis audit to discern what business practices were evident or transparent to regulatory agencies and homeowners, *i.e.*, to determine what fraud a homeowner could detect or an outside party examining BoA's business practices could detect looking only at internal systems. Specifically, BoA wanted to know what information (potentially incriminating information) was transparently observable from internal systems should it be subpoenaed.

151.    In this position Mackler reported directly to Eric Marsing (former Countrywide First VP, now BoA SVP in SGC) and no longer up through Urban. Tiffany Harrison (BoA AVP in SGC) worked for Marsing and Mackler spoke with both she and Marsing regularly in the months that followed. Harrison and Marsing both technically reported to Tom Trujillo (BoA) who himself reported to Jim Emerick. In reality the Root Cause group worked for the BoA Risk Committee, with cross-reporting relationships throughout corporate BoA, SGC and the respective lines of business.

152.    Mackler managed the Root Cause-Denver project, including the team of analysts[77] and was deemed the Project Point Person by BoA executives for the program, until its dissolution in March of 2012. Root Cause-Denver examined Default Servicing, working with BoA six-Sigma engineers and BoA Process Design Consultants within Default Servicing (referred to as "Mod Space" or modification space) as well as with ECR and Servicing Quality Associates. Root Cause-Denver additionally looked at Financial Protection Services, Balboa Insurance Group, as well as Sales and Fulfillment (Origination).

---

[77] The analysts were Nikki Bakkal, Bob Truesdale, Vang Lee, Wesley White, Laquanda Ellison, Wanda Wasielewski, Keysha Baker (who was removed from the project) and eventual QC coordinator Paul Langer.

153.    The Root Cause team received a pre-selected sample of high-risk regulatory and homeowner complaints, complaints containing allegations of real concern to BoA's Risk Committee, and examined them to determine what information existed on Urban or BoA systems to either rebut or confirm the allegations in the homeowner complaints.

154.    Marsing sold this new position to Mackler on the argument that, given Mackler's constant expression of concerns about fraud, he could now officially work to determine what "mistakes" were being made in operation of the HAMP reviews, and would "work with the line of business" to fix and correct those. In fact, as was explained later, BoA wanted to learn what degree of exposure it was facing, particularly with respect to what Congress or Treasury might do if it accessed BoA's internal systems in an effort to detect wrongdoing. Marsing acknowledged the political ramifications and reputational risk that could emerge from these audits, thus emphasizing their importance and sensitive nature.

155.    Mackler worked with Marsing and Harrison to manage the unique team issues that resulted from Root Cause analysts being exposed to such a large sample of information revealing illegal and fraudulent business practices that BoA employed. BoA directed that the nature of the audits that RC-Denver would be exposed to were so confidential in nature that no one from the RC-Denver team was to discuss the results with anyone else at BoA or Urban. This information was only to be communicated to Marsing or Harrison.

156.    Roughly half of the audits conducted by the group (then reviewed by Mackler) consisted of homeowner complaints, often forwarded by individual members of Congress, or inquiries from the Office of the Comptroller of the Currency (OCC), State Attorneys General, or other regulatory agencies, in which a business practice was alleged that had significant regulatory or political exposure. The other half consisted of internal BoA records where an employee documented a business practice that, while accurate, created exposure for the Bank and therefore did not follow the (fraudulent) Bank protocols. The results of the audits were synthesized by Mackler into higher level observations, and then presented by Harrison and Marsing to the BoA Risk Committee.

- 43 -

157.    Marsing and Harrison emphasized to Mackler and the Root Cause group that the company was not attempting to "catch" wrongdoers at BoA.  Harrison and Michelle Dean, a BoA Default Servicing Process Design Consultant, repeatedly emphasized that homeowner complaints about BoA's claim of "missing" HAMP documents (even where homeowners could document repeatedly sending this information) should in fact be captured by Root Cause as merely a "communication" failure ("fail point") or as being the fault of the homeowner ("Customer Adherence").  In this manner, BoA could continue to hide the wrongdoing from internal controls, homeowners, Congress, and the Treasury Department.  Thus BoA was able to perpetrate fraud even within the group ostensibly charged with uncovering it.

158.    Mackler was given repeat direction from Marsing and Harrison regarding what was "fair game" to capture versus what the line of business wanted reported.  Additionally, Mackler was invited to substantively alter allegations of fraud and overt business practices where they had not been properly identified.  Mackler gave his team of analysts direction to capture "what they saw" as they had been initially trained.  Eventually the line of business, Default Servicing, began fraudulently changing the results of the RC-Denver team's audits without their knowledge or consent, while directing them to change the "results" of certain audits that identified falsity in the "HAMP document dialog."  Mackler complained about this, and was told by Marsing and Harrison that lines of business could determine certain things to be "off-limits" to the Root Cause group.  It was up to the BoA line of business to decide how much to cooperate.

159.    Over the course of the next six months, after reviewing thousands of audits by his team and receiving constant direction from BoA executives, it became more evident to Mackler that Root Cause was never designed to identify fraud so as to prevent it, but to identify it so as to remove the evidence of that fraud from the system records.[78]  Mackler participated in high-level

---

[78] In fact, the Siebel computer system of record for regulatory and customer complaints was amenable to *ex post* "correction" by Urban or BoA employees, in fact correction without detection.  In early 2011, Mackler overheard BoA relationship manager Raisley giving direction to "scrub" or clean records from the Siebel system when evidence did not correspond to the fraudulent manner in which an SR was closed.

- 44 -

Risk conference calls with BoA executives, Six-Sigma Engineers, Process Design Consultants,[79] and others in Change Management and the Root Cause Transformation Sub-Committee where it was made even more clear that BoA's HAMP fraud was orchestrated, and entirely by design.

160.    By examining each audit, Mackler observed and was able to document a number of discrete fraudulent practices BoA had developed and maintained in contravention of the HAMP requirements.  These audits went back to the beginning of the HAMP rollout in early 2009 and directly confirmed that the fraudulent practices and protocols have been part of BoA's HAMP operations since its inception:

a.    Mackler learned of the existence of the Urban Portal where original financial documents submitted by homeowners were concealed and not accessible to HRD Associates who were reviewing the homeowners for HAMP modification eligibility, neither were these documents available to Customer Advocates when reviewing related concerns.  Access would show that homeowners had *in fact* often timely and satisfactorily complied with submission requirements (such fraud translating into improper fees and improper determinations of ineligibility).  Mackler discovered that Urban had been contracted to develop this seemingly redundant imaging repository;[80]

b.    He repeatedly saw examples of homeowners whose complaints were responded to in a fraudulent manner, including by failing to disclose bank errors and misconduct, and falsely telling the regulator or homeowner that his or her application was still "under review" even while simultaneously

---

[79] BoA VP/Process Design Consultant Michelle Dean actively worked to prevent Mackler from "capturing" fraud and having such "design" flaws presented to the BoA Risk Committee. Dean consistently directed Mackler, both during his time at Root Cause and in his final weeks with Urban as an In-Line Auditor, to cover-up fraudulent practices.

[80] Dean informed Mackler that another contractor, Stuart, had been tasked to document in the system of record whether homeowners' HAMP documents had been received or were incomplete, without having access to the Urban Portal.  In other words, without being able to see whether they had, or had not.

documenting that the application was "incomplete or missing financials" so as to quickly close the file and terminate the HAMP review;

c. Mackler observed the common BoA practice of intentionally delaying either modification reviews or responses to homeowner inquiries (with the intent that such delay would ultimately cause HAMP ineligibility, given the time period requirements of the Program). This included by "parking" HAMP reviews under the operator IDs of terminated or vacationing HRD employees so as to allow them to age-out and lose HAMP eligibility. This "parking" also often entailed improperly requiring new financials be submitted thus delaying review further and intentionally failing to advise homeowners at risk of losing potential eligibility;

d. As he saw previously, Mackler reviewed numerous audits his team conducted where homeowners were improperly proceeded against in foreclosure while BoA was falsely telling them, or regulators, that such homeowners were under "review" for HAMP modification;

e. As he also saw during his time as a Customer Advocate and QC, Mackler's team audited numerous instances where homeowners provided substantial payments, sometimes under their respective Trial Period modification, but were not properly credited with such payments, thereby risking ineligibility, because those payments were instead parked in a "partial account" as a partial balance not applied to their HAMP obligations (even after the "partial account" balance would constitute more than a full "note" payment as required by HAMP);

f. Mackler's team audited several files highlighting homeowner complaints that they had qualified for HAMP under the NPV algorithm and other requirements, but were improperly placed into proprietary modifications in

- 46 -

violation of requirements that BoA properly consider the homeowner for HAMP eligibility in the first place; and

g.  Numerous instances of persons deemed ineligible for permanent modification status based upon failure to apply proper criteria for conversion from trial status to permanent status.

161.   These fraudulent practices, and Urban's exposure resulting from its participation in them, were brought by Mackler to the attention of Urban President Jim Smith and other top executives at Urban in the fall of 2010.  Smith responded, during one meeting that included most of Urban's top executives, that Mackler and his Root Cause team "needed to remember who they worked for" (meaning Urban).  Smith also expressed anger that Mackler was regularly discussing these matters with BoA executives, despite Mackler's explaining that the orders on Root Cause required such regular contact to report to BoA on the audits, and that he was under specific orders not to discuss the details of these audits.

162.   In a subsequent follow-up meeting with Deborah Adams (AVP of Client Relations at Urban) and then another with Adams and Beranich, Mackler detailed again the fraudulent practices he had observed and was auditing.  Adams stated that the goal coming from BoA was specifically *not* to help place homeowners into the HAMP modification process, but instead, to close files by determining HAMP ineligibility.  Mackler was encouraged to focus on the fact that for Urban employees, the client was BoA, not the various homeowners.  That was the task Urban was contracted to help expeditiously complete with BoA.  Beranich, who then joined the conversation, at one point expressed curiosity whether Mackler was wearing a recording device and recording the conversation.

163.   In January of 2011, David Stevens (whose father Glenn Stevens was at that point General Counsel for Urban) joined the Root Cause project in the role of Team Lead, as part of his rotating executive position within Urban.  Mackler discussed *ad nauseum* with Stevens the fraudulent practices detailed above.  Stevens listened, but no action to address these practices "on the floor" was ever taken.

- 47 -

164.    On January 25, 2010, Mackler met with McManaman, at that point Urban's Production Manager for Quality and Special Projects.  McManaman was under intense pressure to facilitate increased production for both the Regulatory Response team (RRT-Denver) and Business Process Outsourcing 150 (BPO-150) team, as neither were able to meet their crushing daily or weekly BoA-established production goals while also meeting proper HAMP escalated complaint guidelines.  Beranich routinely threatened to terminate McManaman unless she directed her Quality management team (Team Leads of QCs, and Team Leads of In-Line Auditors) to force their reporting employees to "pass through" SRs and audits.  The "production" conversation became the defining context of the Quality review teams, to the point that QCs and Quality auditors were forwarded the number of QCs or audits they were assigned along with the number of "closures" needed before anyone could go home.[81]

165.    McManaman explained to Mackler that she had come to the realization she was inevitably going to be fired.  Mackler told McManaman she should be careful of the direction that she was taking from BoA and cascading to her reports, since she could be personally at risk for "following direction by giving direction" to close cases fraudulently, and to falsify the system of record to obfuscate that.  McManaman explained that everything she was doing was being done at the direction of the Bank, communicated through BoA "handlers" or relationship managers Robbie Nicholson and Kristina Raisley.

166.    During this January 25, 2011, conversation, Raisley (on-site BoA relationship manager at this point) walked in and stated that the daily goal had not been met, and that the Quality standards needed to be "adjusted" to allow for closure of a significant number of SRs.  This rhetoric was a daily business practice of BoA by this point.  McManaman said she would no longer go along with this.  Raisley directed that she didn't have a choice and that if McManaman

---

[81] As standard practice, Team Leads emailed audits of the day to auditors, with language revealing that the audits "needed" to be closed before anyone could go home.  Urban needed to "find a way" to "sharpen the pencil" and "pass through" the SR closures.  A significant number of SRs were being closed based on a "manager exception," which acknowledged that the SR did not meet proper protocols, but a manager had granted permission to close the regulatory or customer complaint without proper research, resolution, or forward progress.

- 48 -

did not go along with it, BoA would replace her with someone who would (as they had done on countless other occasions). Raisley said that the Bank would bear all responsibility for these closures and that Urban would "not be responsible" for the manner in which they were closed.

167.    McManaman explained that she could no longer go along with the fraud, emphasizing to Raisley that homeowners were being irreparably harmed by the improper HAMP review practices, the lack of good faith ECR research and response, and lack of resolution. Raisley sarcastically retorted that if the homeowners were unsatisfied they could always re-escalate. Unfortunately for homeowners this was not an option, especially considering the timeline and lifecycle of foreclosure proceedings and modification reviews.

168.    Raisley left the room and escalated the issue with Urban AVP Justin Svoboda. Svoboda then came into McManaman's office and directed that whatever the client BoA wanted, she needed to accommodate. McManaman pleaded with Svoboda that SRs that could be properly closed were closed, and that nothing else met proper guidelines and could only be closed by fraud. She emphasized the implications of fraudulently closing SRs and falsifying the QC and In-Line Audits, particularly for homeowners. Svoboda made clear that meeting BoA's production goals took priority, not homeowner concerns, as that was the basis for Urban's contract.[82]

169.    At the end of February 2011, Mackler was informed by Urban that the Root Cause project was being cancelled by BoA. Urban executive Jason Taylor (SVP of Outsourced Services) told Mackler that RC-Denver did not fit within the Urban corporate structure, and was not part of the ECR contract with BoA (*i.e.*, not covered by the vendor "Statement of Work"). After that date, Mackler never again verbally spoke to Marsing or Harrison, or worked on Root Cause audits.

---

[82] Both McManaman and Mackler drafted and signed statements describing these January 25, 2011 conversations, out of concern that they needed to protect themselves. They are attached here as Appendix II, Exhs. A-D.

### e.     Root Cause project is dissolved and Relator is terminated

170.    After the dissolution of Root Cause, Mackler was offered two low-level positions within Urban:  document chaser (which was a demotion from being a Customer Advocate) or a Quality position as an In-line Auditor.  Both of these positions were significant demotions for Mackler who had held project management responsibilities, and served as a BoA project Point Person.

171.    Mackler explained to Urban principals that he could not in good conscience go back to a floor-level position that required him to confront and acquiesce in the daily fraud occurring for BoA at Urban.  Mackler felt it was unreasonable for him to be complicit in the fraud, based on his operational knowledge.  For over a week, Mackler attempted to work as an In-Line Auditor but became aware that retaliation against him had already commenced.  He continued, in that position, to object to the ongoing fraud.

172.    On March 17, 2011, Mackler was terminated in retaliation for his complaints about fraudulent activity surrounding BoA's HAMP operation.

## B.     Bank of America Violates the False Claims Act

173.    BoA fraudulently entered into its Servicer Participation Agreement with BoA by untruthfully pledging to develop and maintain a compliant HAMP operation.  It has, since that time, falsely certified its compliance with HAMP requirements, most recently on June 1, 2011.

174.    BoA has acted in violation of various obligations in the Agreement, such violations contravening material conditions, and conditions precedent, to payment of claims under the Agreement.  Such violations render each and every claim for payment of HAMP funds both false and fraudulent.

175.    Contrary to its Agreement, BoA does not and has not "adhere[d] to the Program standards…for all the servicer's loans."[83]  Though obligated by the unequivocal terms of the Agreement to follow all HAMP requirements (BoA "shall perform the loan modification and

---

[83] December Report at 14.

other foreclosure prevention services described in … the 'Program Documentation'")[84] as a condition of participation and payment, "satisfaction by Servicer" of these obligations has not been honored.[85]

176.    BoA, in contravention of its obligations, has failed by design to maintain an "effective[ ] internal control program" to "ensure effective delivery of Services" and "compliance" with the HAMP guidelines, which explains, in part, why BoA has failed to comply with its HAMP obligations.[86]  BoA has not performed HAMP services "with the practice, high professional standards of care, and degree of attention used in a well-managed operation," much less has it performed with the degree of care BoA "exercise[s] for itself under similar circumstances."[87]

177.    BoA has violated the HAMP requirement to "use qualified individuals with suitable training, education, experience and skills to perform [HAMP] Services."[88]  Despite its abysmal HAMP performance, resulting this month in suspension of Treasury payments to it, BoA has failed to "disclose … any facts or information that [the Government] should reasonably expect to know about [BoA] and its contractors."[89]  Though "responsible for the supervision and management" of the contractors it engages to perform HAMP services, BoA fails and has failed to "ensure that all of its contractors comply with the terms and provisions of the Agreement" despite being "responsible for the acts and omissions of its contractors as if the acts and omissions were by [BoA]" itself.[90]

178.    Again this year, BoA has falsely certified, as it has in each Certification, that it has "performed its obligations in accordance with the Agreement…" and that "all Services have

---

[84] Agreement, Sec. 2.A.

[85] Agreement, Sec. 4.A.

[86] Financial Instrument, Sec. 4(a).

[87] Financial Instrument, Sec. 5(d).

[88] Id.

[89] Financial Instrument, Sec. 5(g).

[90] Financial Instrument, Sec. 6.

- 51 -

been offered by Servicer to borrowers, fully documented and serviced by Servicer in accordance with the applicable Program Documentation."[91]

179.    BoA's violation of specific HAMP requirements, all part of the Program Documentation binding on BoA under terms of the Agreement, is systemic and material.  As alleged, BoA continues to and has, *inter alia*, failed to extend invitations to HAMP participation to scores of potentially qualified homeowners (often foisting predatory proprietary modifications upon them instead); failed to review eligibility for such homeowners in good faith; failed to properly credit HAMP payments and waive other fees;[92] failed to review documentation in a timely, good faith manner;[93] failed to review and resolve homeowner "inquiries and complaints…with fair consideration, and timely and appropriate responses and resolution;"[94] failed to accurately record and retain all records, including actual reasons for HAMP denials, and fraudulently required multiple submissions of documents from homeowners;[95] failed to suspend foreclosure activity where required by HAMP;[96] and failed to properly handle inquiries and complaints, including "escalated" cases, in good faith.[97]  Each of these practices occurs in obvious violation of Program Documentation.

180.    Violation of these core provisions of the Servicer Participation Agreement and the Program Documentation incorporated therein has resulted in violations of the False Claims Act

---

[91] Annual Certification, Sec. 3, and Updated and Restated Certification at C-1, Sec. 3, available at https://www.hmpadmin.com/portal/programs/servicer.jsp; Handbook at 38.

[92] Handbook, Sec. 8.1 at 79; Directive 09-01 at 22.

[93] *See* Directive 09-01 at 5, amended later by subsequent Directives imposing abbreviated time periods for Servicer review.

[94] *See* Directive 09-01 at 13 (including by intentionally delaying responses to homeowners and otherwise failing to communicate with them).

[95] *See* Directive 09-01 at 13; Handbook at 46, 52 (including by maintaining a fraudulently concealed document image repository inaccessible to customer advocates and others).

[96] *See* Directive 09-01 at 14; Handbook at 53.  Mackler experienced the difficulty in convincing Foreclosure Technicians with BoA to delay or halt foreclosure sales or other activity. Customer Advocates were routinely informed by foreclosure personnel that procedures in place prevented delaying or suspending foreclosure activity once the activity had begun.

[97] Handbook at 46 ("Servicers must have written procedures and personnel in place to provide timely and appropriate responses to borrower inquiries and complaints in connection with HAMP within the timelines specified in this Handbook").

by rendering BoA ineligible for Government payments under the terms of the Program.  BoA's violations are material to the Government's decision to make said payments, and had the Government been aware of BoA's conduct in violation of its Agreement, the Government would not have paid these monies, just as it is now suspending further payments to this offending Bank.

## VI.   CONCLUSION

181.   In 2010, the Congressional Oversight Panel observed:

> [S]ervicers need to face 'meaningful monetary penalties" for noncompliance with SPAs [Service Provider Agreements[] and denial of modification for an unexplained reason, a breach of their contractual obligations under HAMP SPAs.[98]

182.   The Treasury Department determined last month that BoA's abysmal performance under the HAMP Agreement is unacceptable and warranted suspension of further federal government payments to it.[99]  Evidence now provided by Relator lays bare the previously concealed mechanisms and practices by which BoA has knowingly and willfully failed to perform under the Agreement since its inception, and why each claim for payment under HAMP has been a false claim.

183.   As plainly stated in the Agreement, conditions precedent to Government payment require the faithful implementation of a HAMP modification program.  As Treasury has now concluded, permitting a reduced number of eligible homeowners to take advantage of a HAMP modification is insufficient to establish actual performance under the requirements of the Agreement, particularly where, as here, BoA's performance under the Agreement is calculated to undermine the ability of scores of eligible borrowers to qualify.

184.   Simply put, BoA has made a mockery of a program designed by Congress and the Treasury Department to help millions of struggling American homeowners.

185.   Incentive payments and any other payments to BoA under the terms of its Agreement have been obtained, and are retained, through fraud. Because such conduct violates

---

[98] December Report at 50.

[99] *See* fn.3, *supra*.

the False Claims Act, BoA is liable to the federal Government and needs to be held accountable to the American taxpayers for its actions.

## COUNT I

## FEDERAL FALSE CLAIMS ACT

### 31 U.S.C. § 3729(a)(1)(A)

186.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

187.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

188.    Through the acts described above, since the inception of the HAMP in 2009, Defendants knowingly presented or caused to be presented false or fraudulent claims, records or other materials for payment or approval resulting in significant payments of false claims by the Government to Defendants.

189.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to pay or approve such false or fraudulent claims.

190.    Each payment by the United States under the terms of the Servicer Participation Agreement was the product of a false claim and materially false statements made by the Defendants.  Defendants, due to their fraudulent conduct, rendered themselves ineligible for payments under the Agreement because they, with knowledge and by design, were not and are not in compliance with material terms of the Agreement that are conditions for payment.

191.    The United States, unaware of the falsity and fraudulent nature of Defendants conduct as it relates to the terms of the Agreement, and of the records, statements, and claims made or caused to be made by Defendants, has paid and may continue to pay millions of dollars for claims that would not be paid were the Government aware of Defendants knowing violation of the Agreement and the False Claims Act.

192.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## COUNT II

## FEDERAL FALSE CLAIMS ACT

### 31 U.S.C. § 3729(a)(1)(B)

193.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

194.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

195.    Through the acts described above, since the inception of the HAMP, Defendants knowingly made, used, and caused to be made or used false records or statements material to such false or fraudulent claims resulting in significant payments of false claims by the Government.

196.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Government to pay or approve such false or fraudulent claims.

197.    Each payment by the United States under the terms of the Servicer Participation Agreement was the product of a false claim and materially false statements made by the Defendants. Defendants, due to their fraudulent conduct, rendered themselves ineligible for payments under the Agreement because they, with knowledge and by design, were not and are not in compliance with material terms of the Agreement that are conditions for payment.

198.    The United States, unaware of the falsity and fraudulent nature Defendants conduct as it relates to the terms of the Agreement, and of the records, statements, and claims made or caused to be made by Defendants, has paid and may continue to pay millions of dollars for claims that would not be paid were the Government aware of Defendants knowing violation of the Agreement and the False Claims Act.

199.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.      That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

B.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

C.      That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

D.      That Relator be awarded all costs of this action, including attorneys' fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d); and

E.      That the United States and Relator be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated: July 6, 2011

HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____
Shayne C. Stevenson
1918 Eighth Avenue, Suite 3300
Seattle, Washington 98101
Telephone:  (206) 268-9340
Facsimile:  (206) 623-0594

*Attorney for Plaintiff/Relator Gregory Mackler*

- 56 -